346 F.Supp. 69 (1972)
Adolph M. ROTERMUND, Plaintiff,
v.
UNITED STATES STEEL CORPORATION, a Delaware corporation, et al., Defendants.
No. 71 C 596(2).
United States District Court, E. D. Missouri, E. D.
May 26, 1972.
James L. Sullivan, St. Louis, Mo., for plaintiff.
Thomas L. Croft and John R. Musgrave, Coburn, Croft, Shepherd & Herzog, St. Louis, Mo., for defendants Basic Materials Co. and Raymond F. Powell.
Albert E. Schoenbeck, St. Louis, Mo., for defendant U. S. Steel Corp.

*70 MEMORANDUM OPINION AND ORDER
REGAN, District Judge.
In this action, removed from the Circuit Court of the City of St. Louis, defendants have moved for summary judgment as to each of the three counts of the complaint.
Count I, directed only against defendant United States Steel (USS), seeks specific performance of an alleged agreement to purchase certain shares of stock in Basic Materials Company (Basic) allegedly owned by plaintiff. In Count II plaintiff prays for actual and punitive damages allegedly resulting from a conspiracy of all defendants to induce USS to violate its alleged contractual obligation to plaintiff under the agreement. Count III seeks damages against defendant Basic only by reason of an alleged violation of the Missouri Service Letter Statute.
On June 28, 1965, defendant Powell, then the owner of over 75 per cent of the then outstanding shares of the common stock of Basic, entered into the agreement with USS as to which plaintiff is an alleged third-party beneficiary. It appears from said agreement (1) that of the 77,307 shares of common stock of Basic then owned by Powell, 59,284 were theretofore pledged to the First National Bank in St. Louis, pursuant to a 1962 loan agreement, (2) that Powell had an option to purchase 60,000 shares of common stock at a price of $9.7625 per share, and (3) that USS owned warrants to purchase 51,150 shares of Basic common stock at $8.73. By said agreement, USS agreed to lend to Powell up to $465,000 on a long-term note bearing no interest prior to maturity and Powell agreed to use part of the proceeds of the loan to repay the bank loan and to purchase from USS for $40,000 all of its warrants. As security for the note Powell was to pledge 25,000 shares of Basic common stock. One provision of the agreement precluded Powell, except with the consent of USS, from exercising his option to purchase Basic stock and from exercising his rights as holder of the warrants during the effective period of the agreement.
Paragraph 5 of the 1965 agreement granting an option to USS provides as follows:
"During the period ending on the fifteenth (15th) anniversary of this Agreement and while USS is not in default as to any of its obligations hereunder and while the Note shall be outstanding, or while (but no later than twenty (20) years from the date hereof) USS owns, or is obligated under any circumstance to purchase, any obligations of Basic, USS or its nominee shall have the option to purchase all the stock of Basic which Powell may now or hereafter own.
(a) after the death of Powell; or
(b) after Powell's retirement from the active management of Basic as defined in the last paragraph of this Section 5; or
(c) in the event that (i) an annual audited statement shall disclose that the book value of the common stock, without giving effect to any surplus created by any write-up or reappraisal of any assets, shall be at least 20% less than such book value as disclosed by the audited financial statement for either of two immediately preceding years or (ii) an annual audited statement shall disclose that such book value is at least 15% less than such book value for either of two immediately preceding years and an unaudited statement for the next succeeding half-year delivered to USS pursuant to 13(a)(i) or an audited statement procured by USS for such half-year period shall disclose that such book value is at the date as of which such statement is made at least twenty percent (20%) less than such book value for either of the two immediately preceding years, then such option shall continue until an annual audited financial *71 statement shall disclose that such book value has been restored to the level at which it was in the audited financial statement for either of such preceding years, whichever such level is higher.
For the purpose of clause (b) above Powell will be deemed to have retired from active management of Basic (i) if his physician under whose care he has been for a reasonable period of time, shall give Powell written advice that his continuation in the active management of Basic would involve a substantial probability of material injury to his health and upon such advice Powell has not carried out his duties as an executive officer of Basic, an essential part of which is physical presence in the executive office or operating properties of Basic for at least seven (7) hours during at least one business day in a period of ninety (90) consecutive calendar days and at the end of said period Powell receives written confirmation from his said physician of said physician's original opinion, or (ii) after ten (10) years from the date of this Agreement if Powell has failed so to carry out his duties as an executive officer for any reason for a period of ninety (90) days."
Paragraph 6 of the 1965 Agreement granting an option to Powell is as follows:
"During the period ending on the fifteenth (15th) anniversary of this Agreement and while Powell is not in default as to any of his obligations hereunder, and while the Note shall be outstanding, Powell, his guardian, or his estate or testamentary trustees, as the case may be, shall have an option to require USS or its nominee to purchase all the stock of Basic which he or his guardian, estate, or his testamentary trustees may then hold.
(a) after the death of Powell; or
(b) after Powell's retirement from active management of Basic under the same circumstances as set forth in Section 5(b), above, provided that the option granted in this Section shall forthwith terminate if the President or any person acting as President of Basic shall admit in writing Basic's inability to pay its debts; or Basic shall consent to a receiver or trustee for itself or substantially all of its property to be appointed; or consent to proceedings under the laws of the United States or any state thereof relating to bankruptcy, insolvency or the release of debtors to be instituted by or against itself; or if such receiver or trustee is appointed or such proceedings instituted without the consent of Basic and is not discharged or are not dismissed or stayed, as the case may be, within six (6) months; or suffer any writ of attachment or execution or any similar process to be issued or levied against substantially all of its property which is not released, stayed, bonded or vacated within sixty (60) days after its issue or levy."
The agreement sets forth a formula for determining the purchase price of the Powell stock in the event either of the foregoing options is exercised, together with the manner in which the party is to exercise said option. Another provision in the agreement (Paragraph 12) in addition to limiting Powell's right to sell or transfer any of his stock, manifests the intention of the parties that at all times while the agreement is in effect "the stock subject to the right of USS to purchase (t)hereunder constitutes [at least] 75% of the voting power of the sum of all issued and outstanding stock of Basic."
Plaintiff, an officer of Basic at the time the 1965 agreement was entered into, was the owner, jointly with his wife, of 2000 shares of Basic common stock. Paragraph 10 of the 1965 agreement, *72 upon which plaintiff premises his Count I claim, provides as follows:
"If during the term of this agreement USS shall purchase Powell's stock in Basic pursuant to the terms hereof USS shall within thirty (30) days after such purchase irrevocably offer for sixty (60) days to acquire on the same terms and conditions any stock of Basic which, according to its records, was held by Oliver Keller, Adolph M. Rotermund, Stephen F. Powell or Gale H. Powell, on the date twelve (12) months prior to the date of such purchase. Acquisitions of stock by USS pursuant to this section shall be made within fifteen (15) days of acceptance of USS's offer and tender to USS of the certificates of stock which is the subject of such acceptance."
On July 30, 1968, Powell and USS entered into another agreement whereby Powell granted USS a 90-day option to purchase 25,000 shares of his Basic common stock for $1,966,000 on condition that at the time of closing the sale Powell would surrender to Basic the warrants to purchase 51,150 shares of Basic stock at $8.73 per share he had acquired under the 1965 agreement. On the same day and immediately following the execution of the July 30, 1968 agreement, Powell and USS executed an amendment to the 1965 agreement, to become effective only if USS exercised its option to purchase 25,000 shares of Basic common stock pursuant to the 1968 agreement. Among the various amendments to the 1965 agreement was one deleting the original Paragraph 5 and substituting the following new Paragraph 5:
"During the period ending on the fifteenth (15th) anniversary of this Agreement and while USS is not in default as to any of its obligations hereunder, or while (but no later than twenty (20) years from the date hereof) USS owns, or is obligated under any circumstances to purchase any obligations of Basic, USS or its nominee shall have the option to purchase all the stock of Basic which Powell may now or hereafter own
(a) after the death of Powell; or
(b) in the event that (i) an annual audited statement shall disclose that the book value of the common stock, without giving effect to any surplus created by any write-up or reappraisal of any assets, shall be at least 20% less than such book value as disclosed by the audited financial statement for either of two immediately preceding years or (ii) an annual audited statement shall disclose that such book value is at least 15% less than such book value for either of two immediately preceding years and an unaudited statement for the next succeeding half-year delivered to USS pursuant to 13(a)(i) or an audited statement procured by USS for such half-year period shall disclose that such book value is at the date as of which such statement is made at least twenty percent (20%) less than such book value for either of the two immediately preceding years, then such option shall continue until an annual audited financial statement shall disclose that such book value has been restored to the level at which it was in the audited financial statement for either of such preceding years, whichever such level is higher."
By another provision of the amendment, Paragraph 6 of the 1965 agreement was deleted and a new Paragraph 6 inserted as follows:
"During the period ending on the fifteenth (15th) anniversary of this Agreement and while Powell is not in default as to any of his obligations hereunder, Powell's estate or testamentary trustees, as the case may be, shall have an option to require USS or its nominee to purchase all the stock of Basic which Powell's estate or his testamentary trustees may then hold; provided, however, that such option may not be exercised until after the death of Powell; and further provided *73 that the option granted in this section shall forthwith terminate if the President or any person acting as President of Basic shall admit in writing Basic's inability to pay its debts; or Basic shall consent to a receiver or trustee for itself or substantially all of its property to be appointed; or consent to proceedings under the laws of the United States or any state thereof relating to bankruptcy, insolvency or the release of debtors to be instituted by or against itself; or if such receiver or trustee is appointed or such proceedings instituted without the consent of Basic and is not discharged or are not dismissed or stayed, as the case may be, within six (6) months; or suffer any writ of attachment or execution or any similar process to be issued or levied against substantially all of its property which is not released, stayed, bonded or vacated within sixty (60) days after its issue or levy."
Paragraph 12 was amended to include, for the purpose of computing 75% of the voting power, the 25,000 shares of common stock purchased pursuant to the July 30, 1968 option.
Paragraph 10 of the 1965 amendment was amended to read as follows:
"If during the term of this Agreement USS shall purchase Powell's stock in Basic pursuant to the terms hereof (provided, however, that the purchase of 25,000 shares of Powell's stock in Basic pursuant to agreement dated the 30th day of July, 1968, shall not constitute a purchase within the meaning of the term as used in this paragraph 10), USS shall, within thirty (30) days after such purchase, irrevocably offer for sixty (60) days to acquire on the same terms and conditions any stock of Basic held by Oliver Keller up to a total of 3,250 shares, held by Adolph M. Rotermund up to a total of 2,000 shares, held by Stephen F. Powell up to a total of 2,600 shares, or held by Gale H. Powell up to a total of 2,600 shares. Acquisitions of stock by USS pursuant to this section shall be made within fifteen (15) days of acceptance of USS's offer and tender to USS of the certificate of stock which is the subject of such acceptance. Powell hereby agrees to indemnify USS and save it harmless of and from all damages, costs, and expenses from any suit or suits filed by other stockholders of Basic against USS arising out of the purchase by USS of Basic's stock from Stephen F. Powell or Gale H. Powell pursuant to the terms of this Paragraph 10; provided, however, that Powell shall have full control of defense of any such suits."
Neither at the times the July 30, 1968 agreement and the amendment to the 1965 agreement were entered into or at any time theretofore or thereafter had any circumstances occurred which would have allowed either signatory to the 1965 agreement to exercise the respective options set forth in Paragraphs 5 and 6 thereof. On October 17, 1968, USS exercised its option under the July 30, 1968 agreement to purchase 25,000 shares of Powell's stock. No other stock of Powell has since been sold to USS and Powell has retained his status as majority stockholder. Plaintiff was not a party signatory under any of the agreements with USS nor was he apprised by Powell of the terms of any of the agreements. He became aware of the 1965 agreement by opening a locked drawer in Basic's safe in which Powell placed it, and without informing Powell or anyone at Basic of his doing so removed the agreement and made a copy of it. Plaintiff also became aware of the July 1968 agreements shortly after they had been entered into and of the fact that Powell had received a check from USS in excess of a million dollars. Almost three years later, in July 1971, plaintiff demanded of USS that it buy the entire 2000 shares of Basic stock owned by himself and his wife for the same price per share as USS had paid for Powell's 25,000 shares in October 1968. Apparently, the value of the Basic stock had decreased in the interim.
*74 The issue as to Count I is not, as plaintiff urges, whether a third-party beneficiary may maintain an action to specifically perform a contract made for his benefit. Rather, the decisive issue is whether, assuming such an action may be maintained, the facts demonstrate that USS has breached a present obligation to such third-party beneficiary.
"The rights of a third person to sue on a contract made for his benefit depend on, and are measured by, the terms and provisions of the agreement, and are no greater than those granted by, or provided for in, the contract, as intended by the parties thereto * * *. In order to recover, the beneficiary must bring himself within its terms * * *." 17A C.J.S. Contracts § 519(4)h(b), page 989.
As held in Stephens v. Great Southern Savings & Loan Ass'n., Mo.App., 421 S. W.2d 332, 337, "One suing on a contract allegedly made for his benefit as a third-party beneficiary must accept the contract as it was made by the parties thereto * * *."
The 1965 contract upon which plaintiff relies provides that USS is obligated to purchase plaintiff's stock if "United States Steel shall purchase Powell's stock in Basic pursuant to the terms thereof." Hence, only a purchase pursuant to the terms of the 1965 agreement would give rise to a third-party beneficiary claim by plaintiff. A purchase by USS could not have been made pursuant to the terms of the 1965 agreement absent (1) the existence of the facts which would give rise to the option provided for in either Paragraph 5 or 6 and (2) the exercise of said option whereby USS purchased all of Powell's stock in Basic.
It is beyond dispute that Powell had neither died nor retired from the active management of Basic. It is also beyond dispute that USS had not purchased all of Powell's shares in Basic, and that Powell still retains a majority stock interest in Basic. Under the undisputed facts USS could not and in fact had not purchased Powell's stock pursuant to the terms of the 1965 agreement. It follows that USS is not obligated under that agreement to purchase plaintiff's stock.
Plaintiff argues, in effect, that since Paragraph 10 of the 1965 agreement refers to the purchase of "Powell's stock," without explicitly stating that what is meant thereby is the purchase of all of Powell's stock, USS became obligated to purchase plaintiff's 2000 shares without regard to the number of Powell's shares which USS acquired in 1968. This argument not only ignores the controlling requirement in Paragraph 10 of the 1965 agreement that the purchase by USS be pursuant to the terms thereof (one of such terms, contained in both options, being that all Powell's stock be purchased), but if accepted by the Court would lead to the absurd result that the purchase of even one share of the Powell stock would obligate USS to purchase all of plaintiff's stock.
The language of the agreement is not reasonably susceptible of such construction. It is apparent to us that the purpose of Paragraph 10 of the 1965 agreement (a paragraph which obviously was included at the instance of Powell) was to protect the four named minority stockholders in this close corporation against the adverse effect to their holdings in the event Powell were no longer the dominant stockholder. As we have noted, after the acquisition of the 25,000 shares by USS, Powell was still not only in control but continued to hold a majority of the Basic stock.
Plaintiff also relies upon certain language in the 1968 agreement and amendment by which, so he contends, Powell and USS construed the purchase of 25,000 shares as constituting a purchase pursuant to the 1965 agreement. The language employed in the 1968 amendment expressly states the contrary. Therein the parties parenthetically interpolated into Paragraph 10 their manifest intention that the USS purchase of the 25,000 shares pursuant *75 to the 1968 option agreement "shall not constitute a purchase within the meaning of the term as used in this Paragraph 10." As we view the contract, the inclusion of this language was wholly unnecessary, inasmuch as the purchase of the 25,000 shares could not possibly have constituted a purchase pursuant to the 1965 agreement, but it was no doubt inserted out of an abundance of caution, for which the parties should not be penalized.
Another respect in which Paragraph 10 was amended was to add a further provision whereby Powell agreed to indemnify and hold USS harmless with respect to any suit against USS filed by "other stockholders" arising out of the purchase by USS of Basic stock from Stephen F. or Gale H. Powell "pursuant to the terms of this Paragraph 10." Plaintiff construes this provision as a recognition by USS that the purchase of the 25,000 shares constitutes a purchase under the 1965 agreement. This contention is wholly without merit. What this language means is simply that if USS were to purchase all of Powell's [remaining] stock in Basic pursuant to the 1965 agreement, and thereafter purchase the stock of Stephen Powell and Gale Powell under Paragraph 10 and by reason thereof other stockholders [presumably stockholders other than plaintiff and Oliver Keller] should assert claims against USS, then Powell would indemnify USS and hold it harmless. The exclusion from the indemnification agreement of claims arising out of the possible purchase of the stock held by Keller and plaintiff is understandable, but in any event does not mean that USS was then obligated to purchase the stock owned by Stephen and Gale simply because of the 25,000 shares purchase.
It is also of significance that the 1968 agreement to pay Powell a sum in excess of $67 per share for 25,000 shares was on the express condition that he contemporaneously surrender for cancellation the warrants he had acquired for $40,000 to purchase 51,150 shares of Basic common stock at $8.73 per share. Absent this 1968 condition which Powell met, USS would not have purchased a minority interest in Basic. This additional fact further demonstrates that the purchase was not made pursuant to the 1965 agreement.
There is no genuine issue as to any material fact respecting the alleged liability of USS to plaintiff. We hold that under any view of the facts, USS is not obligated to purchase plaintiff's stock,[1] and would not be obligated to do so unless and until at some future time an option granted in either Paragraph 5 or 6 of the 1965 agreement may be and is exercised. USS is entitled to a summary judgment on Count I.
The foregoing disposition of Count I adversely to plaintiff is also decisive of Count II. Therein plaintiff seeks damages based upon an alleged conspiracy between Powell, Basic and USS to induce USS to violate its alleged contractual obligation to plaintiff under the 1965 agreement to purchase his stock. Inasmuch as USS did not violate the agreement, so that plaintiff may not recover based upon the alleged breach thereof, it follows that there can be no liability on the part of defendants even if there was any evidence (and there is none) that the parties had conspired to such end.
The only purpose of charging a conspiracy is to make the other defendants also liable for the acts of the conspirator who actually breaches the contract. The law of Missouri is well settled that a conspiracy of itself does not give rise to a cause of action and that *76 an essential element of such a claim is an actual breach of the contract. See Howe v. St. Louis Union Trust Co., Mo., 392 S.W.2d 625, and Darrow v. Briggs, 261 Mo. 244, 169 S.W. 118. It follows that defendants are entitled to a summary judgment on Count II.
The remaining Count III, complaining of the violation of the Missouri Service Letter Statute, Section 290.140 RSMo, V.A.M.S., seeks damages against Basic alone. Under the statute, a corporate employer is required to furnish to a former employee upon request a letter setting forth "the nature and character of service rendered by such employee" and "truly stating for what cause, if any, such employee has quit such service." Basic having furnished a letter to plaintiff, the issue of law here presented is whether the letter as written complied with the Missouri statute in the quoted respects.
The entire case was removed by USS under our diversity jurisdiction pursuant to the provisions of Section 1441(c), 28 U.S.C., because of the separate and independent claim asserted against USS in Count I. Count III would not of itself be removable since both parties thereto are citizens of Missouri. Section 1441(c) provides that where a removable claim is joined with one or more non-removable claims, the district court may determine the issues therein or, in its discretion, may remand all matters not otherwise within its original jurisdiction.
Having determined that summary judgment is appropriate as to Counts I and II, so that the removing defendant is no longer in the case, we have concluded in the exercise of our discretion that Count III should be remanded. "Where the federal head of jurisdiction has vanished from the case, and there has been no substantial commitment of judicial resources to the nonfederal claims" federal courts are reluctant to adjudicate the non-removable claims. See Murphy v. Kodz, 9 Cir., 351 F.2d 163. The remand of Count III is particularly appropriate under the instant facts for the reason that the issue for decision on Count III necessarily involves the construction of the Missouri statute and the determination of whether the letter furnished to plaintiff complies with the purpose, intent, meaning and language of that statute. We believe it desirable that the Missouri courts to the extent possible decide such questions of Missouri law.
Accordingly, it is hereby ordered that the motions for summary judgment and each of them as to Counts I and II be and the same are hereby sustained and the Clerk is directed to enter judgment in favor of defendants and against plaintiff on Counts I and II. It is further ordered that Count III of this cause be and the same is hereby remanded to the Circuit Court of the City of St. Louis, Missouri.
NOTES
[1] It is, therefore, unnecessary to decide whether under the terms of the 1965 agreement, the parties signatory thereto have the right to amend that agreement without plaintiff's consent insofar as it affects the rights of plaintiff thereunder. Another question left open is what effect is to be given to the fact that the stock plaintiff seeks to have USS purchase is owned by plaintiff and his wife as joint tenants with right of survivorship.